J. M. LEE, individually and as State Comptroller, v. HECTOR SUPPLY COMPANY, and THE HECTOR LUMBER & SUPPLY COMPANY, INC.

182 So. 613.

Division A.

Opinion Filed July 6, 1938.

96

*Cary D. Landis,* Attorney General, and *H. E. Carter* and *W. P. Allen,* Assistant Attorneys General, *J. Velma Keen* and *A. Frank O'Kelley, Jr.,* for Appellants;

*C. L. Waller* and *B. A. Meginniss,* for Appellees.

BUFORD, J.—This is an appeal and a cross appeal from a final decree, which decree permanently enjoined the collection of the tax under Section 4-B, Class 1, of the Chain Store Act, Chapter 16848, Acts of 1935, on certain classes of sales made by plaintiffs.

The Hector Supply Company and the Hector Lumber & Supply Company brought their bill of complaint against J. M. Lee, individually and as Comptroller of the State of Florida, praying that he and his assistants, subordinates,

deputies, agents and employees be enjoined from collecting or attempting to collect from plaintiffs the taxes or fees specified in the Chain Store Act, Chapter 16848, Acts of 1935.

The bill of complaint, as amended, alleged in substance that the Hector Supply Company has its principal place of business in Miami, with branch warehouses or storage depots at Hialeah, Homestead, Fort Lauderdale and West Palm Beach; that the Hector Lumber & Supply Company has its principal place of business at Belle Glade, with branch warehouses or storage depots at Lake Harbor and South Bay; that plaintiffs are engaged in manufacturing and selling products and commodities hereinafter described, to jobbers, dealers, packers, shippers and growers, within and outside the State of Florida and of the United States; and said commodities and products are sold only for the purpose of resale by the purchasers thereof; that in conducting their businesses plaintiffs distribute said commodities in the following manner: (1) as manufacturer selling directly to the purchaser; (2) as wholesaler selling to dealers for resale; (3) delivering and distributing from storage warehouses situated at various points in the State; (4) by purchase from other manufacturers, dealers and jobbers for delivery direct to the purchaser for the account of plaintiffs; that said commodities and products in which plaintiffs deal are comprised in the following groups; (1) hay, grain and feeds; (2) fertilizers and fertilizers materials; (3) crate materials and hampers; (4) insecticides and fungicides; (5) seeds; (6) implements, such as farm and garden tools; (7) packing house supplies; (8) equipment for golf courses and estates, such as lawn mowers, hose, sprinklers, rollers and the like; (9) lumber and building materials (sold only by the Hector Lumber & Supply Company; (10) miscellaneous, such as bottles, bottle tops,

flower pots, paper bags, cotton bags for fruit and vegetables, chemicals, disinfectants, cleaners, buckets and the like. The bill then alleged that the products enumerated are used in the production, distribution and marketing of agricultural products and gives illustrations; that all sales are made by plaintiffs directly from their storage depots or warehouses and not through a store or stores within the meaning of the Chain Store Act; that Plaintiffs have not, since the passage of said Act, operated a store or stores, within the meaning of said Act; that neither plaintiff comes within the provisions of said Act, neither being required to comply with the provisions thereof, the licenses and taxes in said Act not being intended to affect and not affecting either plaintiff; that although plaintiffs did not believe themselves subject to the license tax under the Chain Store Act of 1933, yet in a spirit of cooperation, and without any intention of admitting that they came within the definition of a "store" as found in said Act, plaintiffs paid the fee demanded by the Comptroller; that the Chain Store Act of 1933 did not provide for a tax on gross receipts, but the gross receipts tax under the 1933 Act is collectible only from those operating retail stores, and plaintiffs are not operating a retail store or stores within the meaning of Chapter 16848, Acts of 1935, and are not liable for the payment of either the license tax or the gross receipts tax as defined therein; that unless restrained, the defendant J. M. Lee will use his official position to enforce as against plaintiffs the penalties prescribed in and by Chapter 16848, Acts of 1935, in violation of plaintiffs' constitutional rights under Sections 1 and 12 of the Declaration of Rights, and Section 1, Article IX, Florida Constitution, and Section 1, Article XIV, U. S. Constitution; that defendant requires the payment of a gross receipts tax on all sales without making a distinction between a sale at wholesale and a sale of a single

article or commodity, even though not conducted in any store; that defendant has announced his intention of enforcing the provisions of the Act retroactively to July 1, 1935, though not until February 25, 1936, was there a judicial determination that any part of the Act was valid; that the defendant is demanding payment of the tax under Subdivision A of Section 4 and under Class 1 of Subdivision B, Section 4, of Chapter 16848, Acts of 1935, and unless the taxes are paid will enforce the penalties provided for in said Act against plaintiffs, and injunction is plaintiffs' only available remedy.

An order was entered temporarily restraining the collection or the attempt to collect from plaintiffs the taxes specified in Chapter 16848, Acts of 1935, and from bringing any suit at law or in equity, or any summary proceeding for the enforcement of any of the provisions of the Act against plaintiffs, the order to become effective upon plaintiffs filing bonds of $500.00 each.

The temporary restraining order was issued and was served on the defendant on April 6, 1936.

On May 1, 1936, J. M. Lee, individually and as Comptroller of the State of Florida, filed his appearance in the cause.

The defendant, on June 1, 1936, filed a motion to dismiss the bill of complaint on the grounds that (1) the bill does not allege sufficient facts to entitle plaintiffs to the relief prayed for; (2) it appears from the allegations of the bill that plaintiffs are subject to the tax imposed by Chapter 16848, Acts of 1935; and (3) it appears from the allegations of the bill that plaintiffs are not entitled to the exemptions claimed under Sub-paragraph (f) of Section 2 of Chapter 16848, Acts of 1935.

On December 19, 1936, the court denied the motion to

dismiss the bill, and allowed the defendant until January 11, 1937, in which to plead further to the bill of complaint.

The defendant, declining to plead further, the court entered its final decree in the cause, which, after stating the findings, contained the following:

"It is, thereupon, considered, ordered, adjudged, and decreed by the Court that the said defendant, J. M. Lee, as Comptroller of the State of Florida, his assistants, subordinates, deputies, agents, and employees, be, and they are hereby, perpetually enjoined and restrained from collecting or attempting to collect from the plaintiffs or either of them, any tax on the gross receipts derived by them, or either of them, from sales as follows:

"(1) As sellers selling their products to dealers, jobbers, and other persons, firms, or corporations, for resale as tangible personal property.

"(2) On sales of products purchased from other manufacturers, dealers, and jobbers without the State of Florida for delivery directly to the purchaser for the account of the said plaintiffs.

"(3) On sales of products purchased from other manufacturers, dealers, and jobbers within the State of Florida for delivery directly to the purchaser for the account of the said plaintiffs.

"(4) On sales of fertilizers and fertilizer materials manufactured by them and sold by them as such manufacturers to others.

"(5) On sales of insecticides and fungicides manufactured by them and sold and distributed by them as such manufacturers.

"(6) On sales of paper wraps, wooden shipping containers, paste for the application of labels, box strappings, and the like articles and products used by the purchaser in the

sale of agricultural and horticultural products and as part of the consideration for the sale of such agricultural and horticultural products.

"(7) On sales of lumber and building materials to building contractors.

"(8) On sales of crate materials and hampers sold to the purchaser to be used for the purpose of shipping or marketing fruits and vegetables and sold by such purchasers as tangible personal property as a part of the consideration for the sale of agricultural and horticultural products.

"It is further ordered, adjudged and decreed that the relief sought by the bill of complaint be, and the same is hereby, denied except as set forth in the paragraph next above."

The defendant assigned as error the holding of the chancellor as contained in the quoted portions of the final decree above numbered (2), (3), (6) and (8).

Plaintiffs cross-assigned as error the holding of the chancellor that (1) plaintiffs operate "stores" under the terms of the Chain Store Act of 1935, and (2) that plaintiffs are subject to the gross receipts tax upon the gross receipts received from the sale of certain products sold by them.

It is contended, in the first question presented, that the chancellor erred in holding as he did in the second and third parts of the third paragraph of the final decree.

The questioned portions of the final decree held that plaintiffs were not liable to pay the taxes imposed by Subdivision B of Section 4 of Chapter 16848, Acts of 1935, "on sales of products purchased from other manufacturers, dealers and jobbers without the State of Florida for delivery directly to the purchaser for the account of the said plaintiffs, for the reasons (a) the said tax would be a tax upon interstate commerce, (b) that said products are not

sold from any store in the State of Florida, and (c) that the liability for the tax, if any at all, would be upon the seller and not upon the plaintiffs"; and "on sales of products purchased from other manufacturers, dealers and jobbers within the State of Florida for delivery directly to the purchaser for the account of the said plaintiffs, for the reason that the liability for the tax, if any at all, would be upon the seller and not upon the plaintiffs."

The language of the chancellor, in the quoted portions of the final decree, taken in its ordinary sense, indicates that he had reference to a sale of products by plaintiffs to purchasers, made in one of their stores, which products were not in stock and were ordered by plaintiffs from manufacturers, dealers or jobbers, some within and some without the State of Florida, to be delivered directly to the purchaser, and charged to the account of plaintiffs. In other words, the only part of a transaction of this type that differs in any respect from a completed purchase made in plaintiffs' store by delivery of the purchased article then and there to the purchaser, is the fact that the product ordered from such manufacturer, dealer, or jobber is delivered directly to the purchaser instead of first being delivered to the plaintiffs and then delivered by the plaintiffs to the purchaser. How can the fact that delivery is made in this manner alter the status of a sale already agreed upon, so that the seller can avoid payment of the tax? Yet the chancellor held that such sales were not subject to the tax imposed by Subdivision B of Section 4 of the Act, Chapter 16848, Acts of 1935.

On the subject of the privilege tax, the United States Supreme Court, in the case of Clark v. City of Titusville, 184 U. S. 329, 22 Sup. Ct. 382, 46 L. Ed. 569, said:

"Plaintiff-in-error, however, contends that the tax in the case at bar is a tax on property, not on the privilege

to do business, because the final incidence of the tax is on the merchant, and is paid by him. But every tax has its final incidence on some individual. That effect, therefore, cannot be urged to destroy well recognized distinctions. The tax in the case at bar is a tax on the privilege of doing business, regulated by the amount of sales, and is not repugnant to the Constitution of the United States."

To the same effect see Wayne Mercantile Co. v. Mount Olive, 161 N. C. 121, 76 S. E. 690, 49 L. R. A. (N. S.) 954. The tax imposed by Subdivision B of Section 4 of Chapter 16848, Acts of 1935, has been held to be a privilege tax, and as such has been held valid as to the tax imposed as to Class 1 thereunder. See State, *ex rel.* Lane Drug Stores v. Simpson, 122 Fla. 582, 166 So. 227; State, *ex rel.* Adams, v. Lee, 122 Fla. 639, 156 So. 249.

In the case of Armour & Co. v. Virginia, 246 U. S. 1, 38 Sup. Ct. 267, 62 L. Ed. 547, the Supreme Court of the United States in holding that a taxing statute of the State of Virginia did not violate the commerce clause of the United States Constitution, gave the following exposition as to what constitutes a burden on interstate commerce:

"In other words, to resume, the error of the argument results from confounding the direct burden necessarily arising from a statute which is unconstitutional because it exercises a power concerning interstate commerce not possessed, or because of the unlawful discriminations which its provisions express or by operation necessarily bring about, and the indirect and wholly negligible influence on interstate commerce, even if in some aspects detrimental, arising from a statute which there was power to enact, and in which there was an absence of all discrimination, whether express or implied, as the result of the necessary operation and effect of its provisions. The distinction between the two has been enforced from the beginning as

vital to the perpetuation of our constitutional system. Indeed as correctly pointed out by the court below, that principle as applied in adjudged cases is here directly applicable and authoritatively controlling. New York v. Robers, 171 U. S! 658, 43 L. Ed. 323, 19 Sup. Ct. Rep. 58; Reymann Brewing Co. v. Brister, 179 U. S. ·445, 45 L. Ed. 269, 21 Sup. Ct. Rep. 201. In saying this we have not overlooked or failed to consider the many cases cited in the argument at bar on the theory that they are to the contrary, when in fact they all rest upon the conclusion that a direct burden on interstate commerce arose from statutes inherently void for want of power, or, if within the power possessed, were intrinsically repugnant to the commerce clause because of discriminations against interstate commerce which they contained."

Does taxation by way of a privilege tax imposed on plaintiffs for the privilege of selling or making a sale of products that plaintiffs ordered from out of state manufacturers, jobbers or dealers, to be delivered directly to plaintiffs' customers and charged to plaintiffs' account, involve any burden on interstate commerce? In the case of Banker Brothers Company v. Commonwealth of Pennsylvania, 222 U. S. 210, 32 Sup. Ct. 38, 56 L. Ed. 168, the Banker Brothers Company, doing business in Pittsburg, Pennsylvania, was charged as a retail vendor, with a tax of 1% on $351,000.00 of sales of automobiles to persons in Pennsylvania, under a statute of that state. The Bankers Brothers Company denied liability on the grounds that the sales were interstate transactions, because no cars were kept in stock except demonstrators, and whenever a customer desired to purchase a car, the Banker Brothers Company had to order it from the George N. Pierce Company, an out of state corporation. The Supreme Court of the United States in upholding the validity of that taxing statute, said:

"The name of the Pierce Company was not mentioned in the order signed by the purchaser. Had there been a breach of its terms he would have had a cause of action against the Banker Brothers Company, with whom alone he dealt. If he had failed to complete the purchase, the Pierce Company would have no right to sue him on the contract. The fact that he was liable for the freight by virtue of the agreement to 'pay the list price f. o. b. factory' did not convert it into a sale by the manufacturer at the factory; neither was that result accomplished because, with the machine, Banker Brothers Company also delivered to the buyer in Pittsburg a warranty from the manufacturer direct.

"These were mere incidents of the intrastate contract of sale between Banker Brothers Company and the purchaser in Pittsburg, who was not concerned wtih the question as to how the machine was acquired by his vendor, or whether that company bought it from another dealer in the same city, or from the manufacturer in New York. The contract was made in Pennsylvania, and was there to be performed by the delivery of the automobile and the payment of the balance of the purchase price. See American Steel & Wire Co. v. Speed, 192 U. S. 500, 48 L. Ed. 538, 24 Sup. Ct. Rep. 365; American Express Co. v. Iowa, 196 U. S. 146, 49 L. Ed. 423, 25 Sup. Ct. Rep. 182. The Court properly held it was not an interstate transaction, but taxable under the laws of Pennsylvania."

On the subject of the power of the state to levy license and privilege taxes on businesses, when the property sold by those taxed businesses is transported in interstate commerce, Corpus Juris contains the following:

"In the exercise of its general police power and its power to license occupations and businesses, a state or municipality may impose a license tax for the doing of local or

domestic business within its territorial jurisdiction, although the property involved may have come originally from an-another state, or although a contract relating to the business may have been made in another state, or although the person or corporation involved may also be engaged in interstate commerce, or although the business, when carried on wholly within the state, may involve deliveries outside the state. In other words, where the property involved is subject to a state property tax, the privilege of engaging in business concerning such property may be taxed. A non-discriminating state license tax imposed on business carried on within the state is valid, although it may incidentally affect or relate to interstate commerce, * * *" 12 C. J. 103, Sec. 141.

The type of transactions referred to in Subdivisions 2 and 3 of Paragraph 3 of the final decree transpired in plaintiffs' store or stores; and as soon as the property had reached its destination where a tax could be levied on it, the privilege of doing business in that particular product could also be taxed. We think the above quoted authorities demonstrate that such transactions do not place a direct burden on interstate commerce, that the transactions are completed in plaintiffs' store or stores, and that plaintiffs, and no other, are liable for the taxes thus imposed. Therefore the chancellor erred in his finding contained in Subdivisions 2 and 3 of Paragraph 3 of the final decree.

It is contended in the second question presented that the court erred in holding that plaintiffs were not liable to pay the tax provided for by Subdivision B of Section 4 of Chapter 16848, Acts of 1935, for the sale of paper wraps, wooden shipping containers, paste for the application of labels, box strappings, crate materials and hampers, to the purchaser to be used by him in selling, shipping and marketing of agricultural and horticultural products, when the

cost to him of such materials is included by him in the sales price of such agricultural and horticultural products.

Section 2(c) of Chapter 16848, Acts of 1935, provides: "A 'retail sale' or 'sale at retail' means a sale to a consumer or to any person *for any purpose other than for resale* in the form of tangible personal property." (Emphasis supplied.)

The writer of this opinion and Mr. Justice TERRELL think that such holding was not error, for the following reasons: The shippers of fruit and vegetables who purchase from plaintiffs the materials with which to crate and ship the produce of the farm are not the ultimate consumers of the individual items purchased from plaintiff's store or stores, because the fruit and vegetables, when ready for shipment, are encased in a unified assembled container, or in the separate items of tangible personal property purchased from plaintiff's store or stores as such. The items purchased are not sold by plaintiffs' customers to others as such separate items, but those items are assembled as a complete container and used for the packing and shipping of farm produce, as a convenient method of transporting the produce, and the producer sells the container along with the produce and could not sell the produce without the container. The assembled containers, as such, have no intrinsic worth to the purchaser of the fruit or vegetables, but they do have intrinsic worth to the packer of such produce, because by employing such method of transporting his produce to the market, it saves him time, saves him spoliation of produce due to unnecessary bruising in transit, gives him an opportunity to advertise his particular brands, and establish a trade by having the public become conscious of it. The container is as an essential agricultural and horticultural implement as is the plow with which the grove is cultivated, or the bag used to gather the fruit from the

tree, or the box in which he carries it to the packing house. Implement is a broader term than tool, utensil or instrument and frequently implies that by which any operation is carried on. See Webster's New International Dictionary.

How many of the ultimate consumers of the fruits and vegetables would purchase the assembled crate or hamper, with its labels pasted on and the paper wraps intact, if the crate or hamper contained no fruit or vegetables, but was empty? The answer obviously would be that no one would make such a purchase. Therefore, it is an essential implement and is purchased for resale as definitely as if every transaction embraced a sale of the contents and a separate sale of the container. The title to both passes. Just as liquids must be kept in some sort of containing vessel if they are to be available for use, so fruit and vegetables when shipped in considerable quantities, because of the convenience and saving to the shipper, are packed in a container of some kind; and the shipper who purchases the materials with which to construct these containers purchases them for resale within the meaning of that term as used in the Chain Store Act, Chapter 16848, Acts of 1935.

When a customer comes into one of the plaintiff's stores and purchases paper wraps, wooden shipping containers, paste for the application of labels, box strappings, crate materials and hampers, for the purpose of using the materials purchased for packing and shipping fruit and vegetables, by wrapping the fruit or vegetables with the paper wraps, placing the wrapped fruit or vegetables in the assembled wooden shipping containers, crates or hampers, applying the paste to make secure on the outside of the container the labels showing the variety, grade and brand of fruit or vegetables to be found in the container, and attaching the box strappings to securely faster the container so that it will carry the fruit or vegetables intact, then such pur-

chaser, within the meaning and intendment of this Act, Chapter 16848, Acts of 1935, is one who has purchased the property for resale in the form of tangible personal property. The majority of the Court, however, hold the contrary view and agree with appellant's contention. Therefore, plaintiffs under the circumstances and conditions attending these sales are now held liable for taxation for such sales, under Sub-division B of Section 4 of Chapter 16848, Acts of 1935.

It is contended by the appellees in the third question presented, that the court erred in holding that plaintiffs are engaged in operating a retail store or stores within the meaning of the Chain Store Act, Chapter 16848, Acts of 1935.

Section 2(g) of the Act provides that "The Term 'store' as used in this Act shall be construed to mean and include any store or stores of any mercantile establishment or establishments * * * in which goods, wares or merchandise of any kind are sold or offered to be sold at retail. * * *" And a sale at retail "means a sale to a consumer or to any person for any purpose other than for resale in the form of tangible personal property."

Section 2(c) of the Act, Chapter 16848, Acts of 1935.

Thus if the bill of complaint alleges anywhere that a retail sale such as is defined in and contemplated by the Chain Store Act of 1935, was transacted or that plaintiffs had goods that they were offering to sell at retail, then the bill of complaint admits that plaintiffs were operating a store or stores within the Act so as to be liable for the taxes imposed by Subdivision A of Section 4 of Chapter 16848, Acts of 1935.

It is true that the bill of complaint alleges that "plaintiffs sell the commodities and products herein described

solely and only for the purpose of resale by the purchasers thereof from said plaintiffs." Yet, the bill also alleges that "in the conduct of their said businesses these plaintiffs handle and distribute said commodities in the following manner; * * * (4) by the purchase of said products from other manufacturers, dealers and jobbers for delivery directly to the purchaser for the account of said plaintiff." The fourth method of doing business alleged in the bill might be construed to indicate by the language employed that the sales made in that manner were sales at retail within the meaning of that term as defined in and contemplated by the Act, Chapter 16848, Acts of 1935, except for the positive allegation elsewhere in the bill of complaint to the effect that all sales are made for the purpose of resale.

The bill of complaint also contains the following:

"That the said products are used in the production, distribution and marketing of agricultural and horticultural products, that is to say, for example, that the crate materials, box shooks, fruit wraps, and packing supplies are sold to companies, persons and individuals who resell the same in the form of tangible personal property, and in the marketing and distribution of agricultural and horticultural products; that the said fertilizers are resold to those who place the same in the soil, where it ultimately becomes a constituent part of the fruit or vegetable which is afterwards sold, marketed and distributed, and, in the case of feeds is used to produce milk or eggs or other dairy, agricultural or horticultural products, and ultimately becomes a constituent part or essential part of said products, which are thereafter sold as tangible personal property. That all sales made by these plaintiffs are made directly from their said storage depots or storage warehouses and not through a 'store' or 'stores' within the meaning of said Act."

These allegations state that the crating materials were sold to companies that resell them in marketing their produce of the farm, which sales are held herein not to be sales for the purpose of resale. The allegations also state that plaintiffs sell directly to the farmer fertilizer to make his crops, and feed with which to sustain his cows and chickens, which sales have been held not to be exempt from taxation under Section 2 (f) of the Act, unless sold to the ultimate consumer by the manufacturer thereof in his retail store. Liggett Drug Co. v. Lee, 126 Fla. 359, 171 Sou. 326. In explanation of the foregoing allegations, plaintiffs attached to and made a part of the bill of complaint an exhibit which contained the following:

"Hector Supply Company manufacture some mixed feeds but the majority of mixed feeds handled by them is manufactured in states other than Florida"; and

"Some of the mixed fertilizers sold by Hector Supply Company are manufactured by them and others bought from Florida or out-of-state manufacturers"; and

"This material is commonly known as box shooks and hampers and is purchased by our company or made for us by Florida and out-of-state manufacturers and sold or distributed by ourselves to dealers, packers, shippers, and growers. Either from ourselves or some source the buyer purchases nails, tools and other equipment and assembles these box shooks to produce a made-up crate or container and in turn uses same for the packing or marketing of an agricultural product."

The explanation contained in the exhibit to the bill of complaint as to the sales of feed and fertilizers indicates that at least a part of the sales made of such products if purchased from others, and not manufactured by plaintiffs, and sold to consumers, is not exempt from taxation

under Section 2(f) of the Act; therefore, a part of the alleged sales having, in effect, been admitted by the bill of complaint, to be retail sales, the allegation that the "sales made by these plaintiffs are made directly from their said storage depots or storage warehouses and not through a 'store' or 'stores' within the meaning of said Act," may be disregarded because it is a conclusion of the pleader as to the legal effect of the alleged transactions, which conclusion is contrary to the definition of a "Store" as contained in the Act. Retail sales made by plaintiffs in the building or buildings occupied by them, under the circumstances alleged, are made in a "store" or "stores" within the meaning of Section 2(g) of the Act, Chapter 16848, Acts of 1935.

For the reasons set forth herein, the final decree should be and it is hereby reversed, in so far as it is in conflict with the views herein expressed, and the cause is remanded for further proceedings not inconsistent with the views of the majority of the Court herein expressed.

It is so ordered.

WHITFIELD, TERRELL, BROWN and CHAPMAN, J. J., concur.